UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE 81 DEVELOPMENT COMPANY,
LLC,

      Plaintiff,

v.

SOIL AND MATERIALS ENGINEERS,
INC., et al.,

      Defendants.
_____/

Case No. 1:19-cv-998

Hon. Hala Y. Jarbou

## OPINION

      This is an action arising under 28 U.S.C. § 1983 and state law.  Before the Court is Defendants' motion to dismiss.  The Court will grant the motion.

## I. Background

### A. Summary

      In 2015, Plaintiff, The 81 Development Company, LLC ("81 Dev"), applied for a special use permit from Peninsula Township to construct a condominium complex on its 81-acre property in the Township.  After a lengthy and complicated process, the Township approved the permit subject to multiple conditions, including environmental testing and monitoring.  (*See* Special Use Permit, Decision & Order on Remand (Jan. 23, 2018), ECF No. 1-100.)  81 Dev  believes that the Township treated it unfairly and in violation of its right to equal protection because the Township approved a permit for a similar development project, called "Vineyard Ridge," without environmental testing or monitoring requirements.

      Defendant James Harless works for Defendant Soils and Materials Engineering, Inc. (SME).  Before approving the permit, the Township hired SME to provide an environmental report

about 81 Dev's project. Harless prepared the report in 2017, opining that the project was a potential threat to human health due to the likely presence of contaminants in the soil. (*See* Compl. ¶ 123, ECF No. 1.) The report urged 81 Dev to conduct environmental testing on its property. (*Id.*)

81 Dev contends that Harless was not a neutral expert. He allegedly worked with the Township's attorney, James Young, and Young's law firm, Young, Graham, and Wendling, P.C. ("YGW") to prepare a "false" report indicating that 81 Dev's property was contaminated. (*Id.* ¶¶ 123.1-123.10.)

This is the third lawsuit filed by 81 Dev regarding the Township's decision.[1] Accordingly, Defendants seek dismissal due to res judicata and failure to state a claim.

## B. 81 Dev's Permit Process

81 Dev submitted its permit application in January 2015, in accordance with the Michigan Zoning Enabling Act and a Peninsula Township ordinance. In July, some property owners adjacent to the project site, including James Komendera, expressed concerns about the environmental impact of the project, particularly with respect to grading of the land. (Compl. ¶ 14.) Nevertheless, the Township's board approved the permit in August 2015, subject to multiple conditions. (*Id.* ¶ 16.)

Komendera appealed the permit decision to the Grand Traverse County Circuit Court. (*Id.* ¶ 18.) In January 2016, the Grand Traverse County Circuit Court approved most of the board's conditions but remanded for further findings on two of the permit conditions. The court concluded that the board had not made adequate findings regarding (1) fire safety and (2) soil erosion, grading, and stormwater, as required to satisfy the local ordinance. (*See id.* ¶¶ 20-26.) Instead,

---

[1] Not including a lawsuit that the parties dismissed without prejudice.

the board had improperly delegated those matters to the Township Engineer and the Township Fire Department for approval. (*Id.*)

*Township Engineer approves 81 Dev's grading and stormwater plans.*

In March 2016, the Township Engineer allegedly approved 81 Dev's grading and stormwater plans. (*Id.* ¶ 30.)

On June 20, 2016, the Michigan Court of Appeals denied Komendera's appeal.

*Residents raise concerns about the environmental impacts of 81 Dev's project.*

Throughout the summer and fall of 2016, the Township received comments from Komendera and other members of the public raising environmental concerns with 81 Dev's project, including the possible presence of "lead, arsenic, [and] farming chemicals" on the development site. (*Id.* ¶¶ 36, 61.) These individuals asked the Township to require 81 Dev to conduct soil testing and prepare an environmental assessment of its property.

*Township's board is replaced.*

On August 2, 2016, the Township held a primary election that resulted in the replacement of all seven members of the Township board. One of those new board members, Robert Manigold, contended that dissatisfaction with the Township's handling of 81 Dev's permit application motivated the campaigns of the new slate of board members. (*Id.* ¶ 45.)

*Township's attorney raises the possibility of environmental testing.*

In December 2016, the Township's attorney, James Young, told 81 Dev that assessing the impacts of its grading plan might require 81 Dev to conduct environmental testing on its property. (*Id.* ¶ 76.) Thereafter, Young exchanged emails with the Township Engineer, Brian Boals, asking him to "recommend [environmental] testing that is professionally justifiable given the historical

use of [81 Dev's] property." (*Id.* ¶ 78.)  Young told Boals that he expected 81 Dev to push back on that recommendation but he hoped that 81 Dev would conduct testing voluntarily. (*Id.*)

In January 2017, a firm called Otwell Mawby produced a report assessing the "adverse impact" of 81 Dev's project. (*Id.* ¶ 91.)  The report acknowledged the presence of lead and arsenic in the soil, noting that they "accumulate in the upper soil horizon" because they are "immobile in the soil column." (*Id.*)  However, Otwell Mawby concluded that 81 Dev's grading operations would not have an adverse impact if soils are "managed and contained onsite." (*Id.* ¶ 92.)  In addition, there would be "little potential for adverse impact from stormwater runoff to adjacent properties" if 81 Dev adhered to a grading plan previously approved by Boals. (*Id.*)  Boals and Young both received a copy of that report.

Boals subsequently contacted Young's law firm, YGW, recommending that they confer with Defendant Harless regarding concerns about agricultural contamination.  Young agreed, suggesting that Harless prepare a separate report about the property in response to the Otwell Mawby report.  Boals also provided Young a draft of his recommendations regarding the 81 Dev project.  These recommendations included the requirement to conduct an environmental assessment on the property.  Young edited those recommendations to clarify that they were consistent with the requirements of the Township's zoning ordinance. (*Id.* ¶ 100.)

*Township hires Harless to assess 81 Dev's project.*

Boals reached out to Harless in February 2017.  Around that time, Young told Boals in an email that it was important for Harless to "evaluate the on-site conditions [of 81 Dev's property] and whether grading could spread contaminated soils to nearby property via wind, rain or other mechanisms." (*Id.* ¶ 109.)  Young wanted Harless to know that "this project will most likely be

litigated," but Young believed he had persuaded 81 Dev's attorney that "environmental testing MUST be done." (*Id.*)  Boals forwarded Young's comments to Harless.

*Young provides directions to Harless.*

A few days later, Young gave specific directions to Harless:

It is important that you understand why your report is a crucial part of the Township's processing of this development and, also, that you understand the position of the developers['] consultants.  Also, this project is opposed by a large number of citizens who have their own attorney and their own environmental consultant.  Whatever decision that the township banks [sic] will be litigated by the losing side.  Thus, it is crucial that the Township's decision be based on well reasoned reports by qualified environmental experts. . . .

The key section of the zoning ordinance (ZO) is section 8.1.3(K).  Brian Boals sent you a copy of the ZO. You need only focus on that section. . . It would be extremely important to the Township if your report contained the following concepts:

1. based on your expertise and professional experience, if you agree that environmental testing is an appropriate meanings [sic] of determining whether "adverse impacts" could impact adjacent properties during grading, then please provide your professional opinion.  You have accurate information regarding the historical use of the property in Brian Boals last report.

2. if you believe that the amount of the grading for this project or its location is of significance in determining whether an adverse impact could occur, then please state this.

3. if you know of any other law or regulation (excluding the ZO) that would be applicable to this property, given its historical use, please contact me and I may have you include it if legally relevant.

4. please state the "type" of environmental testing that should be conducted on a site like this.

Lastly, I would like your comments regarding all of the reports that we have from the experts obtained by the developer and the opponents. This should NOT be in your report. Such communication should be directly with me.  If you disagree with any aspects of those reports, then I need to know it and the basis for your disagreement. I can then decide how and when to use this information.  Note that environmental testing is only step one.  Once we have the results, step two is a determination by the experts (with you being the key neutral expert) regarding what the next steps (such as remediation, altering locations of grading, etc.) should be, if any.

(*Id.* ¶ 114.)

In early March 2017, Harless sent Young a draft report.  Young responded with several

suggested revisions, including the following:

a. language usage "to make it easier for a Judge";

b. suggesting testing locations be selected by Harless, "not leave it up to the developer";

c. "Last paragraph – please add the following concept if you agree with it: environmental testing and "soil control plans" (my wording – please use standard terminology) are needed so that the township can make a determination under the zoning standard as to whether there would be adverse impacts on "adjacent and neighboring land" (take direct quote from 8.1.3.k).  **I ask that this be added because** this [sic] **our only legal basis for requiring the testing and plans is this standard. I have provided a legal opinion that 8.1.3.k be interpreted this way** (given the historical use of the land, environmental contamination is an obvious potential "adverse impact") **and, unfortunately, the township has not applied the zoning ordinance exactly this way before** (but it has come close).  To the extent that an expert with your professional expertise interprets the standard in a similar manner, such an expert opinion will reinforce my 'legal expert opinion'. . . . "

d. Have you been given enough site plans (slopes, nearness of adjacent and neighboring lands to mention, grading locations, etc.) to discuss or note the following?  IF there are contaminated soils and grading disturbs those soils, then adjacent and neighboring lands could be 'adversely impacted' by the movement of the contaminated soils onto those neighboring lands by high winds, heavy rain (or any other factors that you can think of) during or after grading. This simply reinforces the concept of 'adverse impact.'"

(Compl. ¶ 119 (quoting 3/9/2017 Harless – Young Email, ECF No. 1-70 (emphasis in complaint)).)

Young told Harless to send his final report to Boals, who would submit it to the Township

planning committee.  Young indicated that he would also send a copy of the report to 81 Dev's

attorney and to an attorney representing citizens opposed to 81 Dev's project.  (*Id.* ¶ 122.)  Young

continued:

If the developer decides to undertake the testing, then I will encourage them to provide a 'testing site plan' so that you and [Boals] can advise the Township Board whether the testing locations are reasonable.  Depending on the test results, you can recommend the next step.  If no further steps are needed, then a final public hearing will be set.

> If the developer decides not to do testing, then I will ask the Township to set a public hearing. I may need a supplemental report from you reemphasizing the importance of the testing in determining 'adverse impacts' and explaining what those 'adverse impacts' could be or ask that you attend the meeting. **If no testing will be done, then the project must in my opinion be denied by the Township board and we go to Court.** Thus, comments made at the public hearing and a supplemental report by you (or your live input) will be placed into the Township's findings of fact under the Zoning Ordinance and, thus, will be crucial since the judge will review the adequacy and reasonableness of those findings.

(*Id.* (emphasis in original).)

> *Harless submits his opinion to the Township, recommending an environmental assessment.*

Harless issued his final opinion letter on March 15, 2017. Among other things, he opined that, due to the property's historic use for orchard cultivation, there was a "high probability" that the soil on the property is "contaminated with hazardous substances," such as arsenic, lead, and pesticides. (Harless Letter, ECF No. 1-74, PageID.386.) Based on his experience, such sites are "often not suitable for single-family residential use without prior removal of the contamination or other mitigation of exposure threats." (*Id.*) Contact with the soil or consumption of groundwater would pose a threat to human health. Also, there was a high probability that lead and arsenic levels would be sufficient to cause potential harm to neighboring properties and residents if contaminated soil escaped the site. In his opinion, 81 Dev would be "jeopardizing human health if they have not assessed, or do not assess, the potential presence of hazardous substances prior to development, and then take appropriate exposure mitigation actions if contaminants are present at levels above restricted residential cleanup criteria." (*Id.*, PageID.387.) Accordingly, he opined that "the Township needs the results of a thorough environmental assessment of the Property to make an informed determination under the zoning standard as to whether the soil disturbances during site grading and development could cause adverse impacts on adjacent and neighboring land." (*Id.*, PageID.388.)

Two days later, Young sent Harless's opinion letter to 81 Dev's attorney, stating that "[u]nless [81 Dev] wants to do the testing, the next step is either litigation or the setting up of a hearing." (Compl. ¶ 125.)  In anticipation of litigation, Boals and Harless discussed the possibility of Harless providing litigation support services for the Township.  (*Id.* ¶ 129.)

*Township grants permit to Vineyard Ridge.*

While the Township was reviewing 81 Dev's permit, the Township was considering a special use permit application for Vineyard Ridge, which had submitted its application in April 2016.  Like 81 Dev, Vineyard Ridge planned to construct a housing development on land formerly used for orchard cultivation.  The Township's planning commission approved that application with conditions in March 2017.  (*Id.* ¶ 127.)   None of those conditions involved soil testing or monitoring.  (*Id.*)  The Township's board approved the permit on April 25, 2017.  (*Id.* ¶ 134.)

*81 Dev files suit alleging equal protection violation; agrees to conduct testing.*

That same month, 81 Dev filed suit in Grand Traverse County Circuit Court, claiming that the Township had deprived 81 Dev of its right to equal protection.  The Township's liability insurer retained Harless and SME as "expert litigation support."  (*Id.* ¶ 137.1.)  The parties stipulated to dismiss that case without prejudice on August 30, 2017, after Otwell Mawby conducted testing on the soil at 81 Dev's property.  (*Id.* ¶ 138.)  The testing allegedly confirmed that the environmental issues on 81 Dev's property were "materially identical to that at Vineyard Ridge – no health hazards from dust inhalation, no dangers from lead, mercury, or any of the other [issues raised by Harless] – only possible issues regarding trace arsenic from repeatedly eating the soil on an extended . . . daily basis or direct and extended . . . skin exposure." (*Id.*)

*Township's insurer raises equal protection concerns.*

After dismissal of that case, Timothy Wilhelm, the attorney for the Township's insurer, sent Young and Harless a memorandum explaining that imposing conditions on 81 Dev due to the presence of residual agricultural chemicals on its property, without doing the same for Vineyard Ridge, raised "equal protection concerns."  (*Id.* ¶ 138.1.)  In particular, Wilhelm noted

> serious concerns about the validity and legality of the [Township] Board reaching
> findings, imposing conditions, or denying The 81 SUP/PUD based on the presence
> of residual agricultural chemicals which fall within the agricultural exemption in
> Part 20101(1)(pp)(iv) meaning that The 81 would have no obligation under State
> law to remediate, clean up, or exercise due care in connection with its development
> of the property.  The Township's Zoning Ordinance does not include special land
> use standards that address environmental contamination or require remediation. . . .

(9/15/2017 Wilhelm Letter, ECF No. 1-124, PageID.730.)  Wilhelm also noted 81 Dev's position that "Vineyard Ridge has environmental and soil issues similar to those present on [81 Dev's] property, and yet the [Township] Board approved the Vineyard Ridge development in April 2017." (*Id.*)

*Harless attempts to distinguish 81 Dev's project from Vineyard Ridge.*

81 Dev hired an expert, Andrew Smits, who produced a report purportedly demonstrating similarities between the environmental conditions at Vineyard Ridge and at 81 Dev's site.  Harless prepared a rebuttal to that report, attempting to identify differences between the two properties. He sent that rebuttal to Wilhelm.  (*Id.* ¶¶ 140-140.1.)  81 Dev alleges in its complaint that, among other things, the rebuttal falsely stated that, unlike 81 Dev's property, the Vineyard Ridge site "was subject to regulation under Part 201 of the Michigan Natural Resources and Environmental Protection Act (NREPA) by virtue of the disclosure of a Baseline Environmental Assessment (BEA) report to the Michigan Department of Environmental Quality (MDEQ)."  (*Id.* ¶ 140.)

Wilhelm sent Harless's rebuttal to 81 Dev's attorney, who responded that, in fact, Vineyard Ridge was subject to an agricultural *exemption* from the Part 201 regulations, and that there was

no BEA or due care plan on file with the MDEQ for Vineyard Ridge.  (*Id.* ¶ 141.1.)  After Wilhelm

passed this information on to Harless, Harless told Wilhelm, "This will change at least one of my

response strategies."  (10/13/2017 Harless-Wilhem Email, ECF No. 1-120.)

       *Township's insurer again raises concerns about equal protection issues.*

       Wilhelm again informed Young and the Township of the "risk" of equal protection issues

if the Township "address[ed] the environmental issues on [the 81 Dev permit] differently than

Vineyard Ridge."  (10/18/2018 Wilhelm Letter, ECF No. 1-122, PageID.718.)  On the other hand,

Wilhelm noted "legitimate bases on which to distinguish the Township's approach to Vineyard

Ridge from [81 Dev]."  (*Id.*)  For instance, the Township and its staff apparently believed that the

previous owner of Vineyard Ridge had performed a BEA, thereby subjecting it to "due care

obligations" and compliance with state environmental regulations.   (*Id.*)   However, that

understanding was now "in question," and "additional information" would be necessary to

compare the Vineyard Ridge project to 81 Dev's project.  (*Id.*)  Wilhelm indicated that approving

81 Dev's permit with conditions, such as a soil management plan, would reduce the potential for

further litigation.  (*Id.*, PageID.719.)

       *Harless recommends a soil management and monitoring program for 81 Dev's project.*

       Around that time, Harless sent Wilhelm a revised rebuttal letter, removing discussion about

the Township board's purported "reliance on the BEA" for Vineyard Ridge to distinguish the

permit for that project.  (10/18/2017 Harless Email, ECF No. 1-121.)  Wilhelm forwarded that

letter to the Township.  Among other things, the letter noted the presence of arsenic in 81 Dev's

soil, as determined by the soil assessment conducted by Otwell Mawby.  (10/20/2017 Harless

Letter, ECF No. 1-91.)  Harless opined that migration and erosion of the soil during construction

could "adversely affect the adjacent or neighboring properties[.]"  (*Id.*, PageID.454.)  Accordingly,

he recommended that the Township require 81 Dev to develop a more stringent soil management plan than the one it had already provided, along with a "performance monitoring and inspection program." (*Id.*, PageID.458.)

Consistent with the recommendations by Harless and Wilhelm, the Township hired ASTI Environmental to prepare a soil management plan for the 81 Dev project. ASTI completed that plan and provided it to the Township on December 6, 2017. (*See* ASTI Soil Management Plan, ECF No. 1-93.)

The Township's board met on December 12, 2017, to consider 81 Dev's permit. At the meeting, Harless advised that the State of Michigan, not the Township, has control over regulating exposure to environmental contamination at 81 Dev's site; however, there was a "potential for adverse effects if that contaminated soil leaves the property and is deposited on the adjoining or neighboring sites." (Compl. ¶ 150.) Harless recommended a condition in the permit requiring 81 Dev to keep contaminated soil on site, in accordance with the plan prepared by ASTI. (*Id.*)

*Township approves 81 Dev's permit, subject to soil management and monitoring.*

The Township's board acted in accordance with Harless's advice. It approved the permit on January 23, 2018, subject to numerous conditions, including the following:

> 10. The ASTI Environmental Soil Management Plan dated October 25, 2017 and December 6, 2017 is hereby incorporated into the project plans and grading and site construction activities shall be subject to and governed by the ASTI Environmental Soil Management Plan . . . .
>
> * * *
>
> 19. A qualified third party enforcing agent, acceptable to the Township, shall be retained by or on behalf of the Applicant/Developer/Contractor, at its sole cost, to implement the ASTI Soil Management Plan, including the monitoring and inspection program outlined in Section 5.0. The enforcing agent shall be responsible for monitoring and inspecting the grading and site construction activities on the property for compliance with the Soils Management Plan, the project plans, and the SESC Permit to ensure the grading will not adversely affect the adjacent or neighboring properties. . . .

11

(Special Use Permit, ECF No. 1-100, PageID.580-581.)

### C. 81 Dev's Prior Lawsuits

81 Dev brought its second lawsuit in Grand Traverse County Circuit Court on March 21, 2018.  (Joint Statement of Material Facts ¶ 4, ECF No. 27.)  81 Dev sued Young, the Township, and another entity (The Grand Traverse Regional Land Conservancy), claiming that they had deprived 81 Dev of its right to equal protection and had conspired to do so.  (*See* Compl., *The 81 Dev. Co. v. Peninsula Twp.*, Case No. 2018-34327-CZ (Grand Traverse Cnty. Cir. Ct.), ECF No. 30.)  That case (the "State Case") resolved in February 2019.  First, the court granted Defendant Young's motion for summary disposition and dismissed most of the claims against him with prejudice.  (*See* State Case, 12/28/2018 Order, ECF No. 29, PageID.1288.)  Among other things, the state court determined that the evidence did not support a claim for denial of equal protection against Young because he was not involved in the Vineyard Ridge decision.  (State Case, 12/17/2018 Mot. Hr'g Tr. 15-17, ECF No. 28-15.)  And the court found that there was no basis for a conspiracy claim against Young.  (*Id.* at 17.)  The court later dismissed the remaining claim against Young, which was for injunctive relief, because "the substantive claims upon which [it rested had] been dismissed[.]"  (State Case, 2/22/2019 Order, ECF No. 29, PageID.1291.)  The remaining parties subsequently stipulated to dismiss the Township and the conservancy with prejudice.  (State Case Orders, ECF No. 29, PageID.1294-1298.)

On May 22, 2019, 81 Dev filed a substantially similar complaint against Young's law firm, YGW, in the Western District of Michigan.  *See The 81 Dev. Co. v. Young, Graham, & Wendling, P.C.*, No. 1:19-cv-408 (W.D. Mich.) (the "Federal Case").  The parties settled that case and stipulated to dismiss it with prejudice in September 2019.  81 Dev filed the instant case in November 2019.

## II. Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. Analysis

#### A. Res Judicata (Claim Preclusion)

Defendants contend that the judgments in the State Case and the Federal Case bar 81 Dev from bringing its claims against them in this proceeding under principles of res judicata (claim preclusion). "The doctrine of res judicata includes two separate concepts—issue preclusion and claim preclusion." *Wilkins v. Jakeway*, 183 F.3d 528, 532 (6th Cir. 1999). "Claim preclusion or true res judicata . . . 'refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.'" *Id.* (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984)).

Because the prior cases involve a state-court judgment and a federal court judgment, both federal and state principles of res judicata apply. Federal courts give the same preclusive effect to a state-court judgment as that judgment would receive in the rendering state, meaning that "if an individual is precluded from litigating a suit in state court by the traditional principles of res judicata, he is similarly precluded from litigating the suit in federal court." *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011) (quoting *ABS Indus., Inc. ex rel. ABS Litig. Trust v. Fifth Third Bank*, 333 F. App'x 994, 998 (6th Cir. 2009)).

Michigan law bars a second, subsequent action when "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004). Michigan takes a "broad approach" to the doctrine of res judicata, "holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Id.*

14

In contrast, "[t]he preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).  For claim preclusion, federal courts apply a test like the one in Michigan, but with one additional element:

> A claim is barred by the res judicata [or claim preclusive] effect of prior litigation if all of the following elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Trs. of Operating Eng'rs Local 234 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 380 (6th Cir. 2019) (quoting *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (quotation marks omitted)).

### 1. Decision on the merits

Under both federal and state law, the voluntary dismissals with prejudice in the Federal Case and the State Case constitute final decisions on the merits.  *See Warfield v. AlliedSignal TBS Holdings, Inc.*, 267 F.3d 538, 542 (6th Cir. 2001) ("A voluntary dismissal with prejudice operates as a final adjudication on the merits and has a res judicata effect."); *King v. Tenharmsel*, No. 350065, 2020 WL 5582722, at *3 (Mich. Ct. App. Sept. 17, 2020) ("[I]t  is well settled that a voluntary dismissal with prejudice is an adjudication on the merits for res judicata purposes.") (citing *Limbach v. Oakland Cnty. Bd. of Cnty. Rd. Comm'rs*, 573 N.W.2d 336, 340 (Mich. Ct. App. 1997)).

### 2. Matter that was or could have been resolved

81 Dev's claims could have been resolved in its prior lawsuits, which were based on substantially the same facts as this case.  Furthermore, 81 Dev was aware of Harless and SME's involvement in the permit process, as 81 Dev repeatedly mentioned them in the allegations of its

complaints filed in those cases.  Indeed, 81 Dev's complaint in this case is largely a reproduction of its prior complaints.

### 3. Identity of the causes of action (federal law)

Federal common law requires an identity of the causes of action.  That requirement has been met here because the Federal Case is based on the same set of facts as this case.

### 4. Same parties or their privies

Harless and SME were not parties in the State Case or the Federal Case.  Consequently, they focus their arguments on whether they are in privity with the defendants in those cases, Young and the Township (in the State Case) or YGW (in the Federal Case).

### (a) Privity – Michigan law

Under Michigan law, privies are parties "so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert."  *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004).  "The outer limit of the doctrine traditionally requires both a 'substantial identity of interests' and a 'working functional relationship' in which the interests of the nonparty are presented and protected by the party in litigation."  *Id.* (citation omitted).  "Examples of such parties in interest include 'a principal to an agent, a master to a servant, or an indemnitor to an indemnitee,' or someone who inherits or acquires the party's interest after judgment is rendered." *Baum v. David M. Baum, P.C.*, No. 333173, 2017 WL 4654976, at *4 (Mich. Ct. App. Oct. 16, 2017) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 359 (Mich. Ct. App. 2003)).

Defendants argue that Plaintiff's allegations show that Harless acted as an agent of Young and/or the Township.  However, the Restatement (Third) of Agency indicates that a service provider who "simply furnishes advice and does not interact with third parties as the representative of the recipient of the advice" is not an agent.  Restatement (Third) of Agency § 1.01(c) (2006).

16

Michigan courts take guidance from the Third Restatement of Agency.  *See, e.g.*, *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 249 n.42 (Mich. 2011); *Dept. of Agriculture v. Appletree Marketing, LLC*, 779 N.W.2d 237, 246 n.39 (Mich. 2010); *Niederhouse v. Palmerton*, 836 N.W.2d 176, 181 (Mich. Ct. App. 2013).  Here, the recipients of Harless's advice were Young and the Township.

On the other hand, Harless also presented his advice to the public, ostensibly as a representative of the Township, which had been sued in the State Case.  Indeed, 81 Dev itself argues that Harless "spoke for the Township" in a public meeting, in support of the environmental requirements in the permit.  (Pl.'s Br. 1, ECF No. 28.)  And 81 Dev alleges that Defendants "were hired by the township's engineers and paid by the township's insurer to render opinions, put them in writing, and come speak at public meetings at the request and behest of . . . the Township." (*Id.* at 14.)  81 Dev's complaint refers to Harless's statements at the December 12, 2017, Township board meeting.  (*See* Compl. ¶ 150.)  Among other things, Harless told those present, including members of the public:

> Good evening.  James Harless with SME.  I was retained to take a look at the site to evaluate the potential for adverse effects on the properties. . . .
>
>                             \*\*\*
>
> [B]ecause there is high levels of arsenic on the property, it does create the potential for adverse effects if that contaminated soil leaves the property and is deposited on the adjoining or neighboring sites.
>
> So we did determine that that was an issue.  The exposure issue on the site is direct contact.  The contaminants are below the level that would be an issue if you inhaled the dust.  So we are not so much worried about the exposure of people outside the site with dust being generated, but it's the material that could come off site either tracked out on vehicles, being discharged in dust generated during the grading and construction activities, or that might be washed off the site in storm water runoff and deposited on the adjoining properties.
>
> So that being said, we can't really -- we don't have regulatory control.  I mean having the State of Michigan on the site, but the risk to adjoining and neighboring properties can be [m]itigated if the material stays on site.

> So the challenge is to come up with a performance criteria that says as a condition
> of doing the work, keep the contaminated soil on site. . . .

(12/12/2017 Public Meeting Tr. 28-29, ECF No. 1-97.)

Notably, when stating that "we don't have regulatory control," and referring to the "challenge" of coming up with a "performance criteria," Harless was lumping himself together with the Township.  And he had already given the Township his views, so his comments were directed at members of the public.  This conduct puts him outside the exclusion in the Third Restatement for a service provider who does not interact with third parties as the representative of the recipient of the advice.

Nevertheless, on the present record, and drawing all reasonable inferences in favor of 81 Dev, the Court cannot conclude that Harless acted as an agent of Young or the Township. "[A]gency posits a consensual relationship in which one person, to one degree or another or respect or another, acts as a representative of or otherwise acts on behalf of another person *with power to affect the legal rights and duties of the other person*."  Restatement (Third) of Agency § 1.01(c) (emphasis added).  "More specifically, '[a]n agency is defined as a fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions."  *Law Offices of Jeffrey Sherbow, PC v. Fieger & Fieger, PC*, 930 N.W.2d 416, 426 (Mich. Ct. App. 2019) (quoting *Logan v. Manpower of Lansing, Inc.*, 847 N.W.2d 679, 683-84 (Mich. Ct. App. 2014)).  In addition, "fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him."  *St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/Mich. Educ. Ass'n*, 581 N.W.2d 707, 716 (Mich. 1998).

Here, the complaint and the other documents in the record do not indicate that Defendants Harless or SME could bind Young or the Township by their words or actions.  Nor do those

documents indicate that Young or the Township had the right to control the conduct of Defendants with respect to the matters entrusted to them.  The Township ostensibly hired Defendants to provide advice.  Young apparently provided some input into the content of Harless's advice, but Young did not require Harless to accept this input.  Furthermore, the sort of control that creates an agency relationship is control over "the method of the work."  *See Laster v. Henry Ford Health Sys.*, 892 N.W.2d 442, 448 (Mich. Ct. App. 2016) (quoting *Campbell v. Kovich*, 731 N.W.2d 112, 117 (Mich. Ct. App. 2006)).  No such control is evident here.  Thus, the Court is not persuaded that Harless or SME were agents of Young or the Township.

Defendants also argue, in passing, that they can demonstrate privity based on the more expansive definition of privity under Michigan law, which requires a "substantial identity of interests" and a "working functional relationship," such that the interests of the nonparty are presented and protected.  *See Adair*, 680 N.W.2d at 396.    Relying on *Whitney Properties, L.L.C. v. Philip F. Greco Title Co.*, No. 283120, 2009 WL 2195106 (Mich. Ct. App. July 23, 2009), Defendants argue that their interests are substantially identical to the interests of the Township and Young, ostensibly because they all would argue that the Township's ordinance is properly interpreted to require the environmental conditions that the Township imposed in its permit.

*Whitney* is distinguishable.  In that case, the Michigan Court of Appeals found a substantial identity of interests between builders sued in a prior action to recover under an option agreement and a title company sued in the action before the court.  *Id.* at *3.  The builders were party to the option agreement and the title company acted as an escrow agent under that agreement.  *Id.*  The court found a substantial identity of interests because "plaintiff's claims against both sets of parties depended on it successfully asserting its interpretation of the [option] agreement."  *Id.*

*Whitney* is perhaps best interpreted as an application of the rule that a party cannot raise successive claims against different defendants over the same property interest.  *See Taylor*, 553 U.S. at 894 (noting that certain instances of nonparty preclusion arose from "the needs of property law"); *accord* 18A Edward H. Cooper, Charles Alan Wright, & Arthur R. Miller, *Federal Practice & Procedure* § 4448 (3d ed.) (noting that, in some cases, "[p]reclusion is extended or denied in an effort to protect conflicting property interests rather than an effort to implement concepts of participation or representation").  The funds owed by the builder were the same funds held by the title company.  Different lawsuits over those funds could give rise to conflicting claims over that property.  That specific concern is not present here because property rights are not at stake.

In addition, the court in *Whitney* found that issue preclusion also applied to the case, so its holding regarding claim preclusion was not necessary for the result.  Consequently, *Whitney* is not persuasive.

Finally, Defendants argue that privity is not necessary under Michigan law when asserted defensively, citing *Monat v. State Farm Insurance Co.*, 677 N.W.2d 843 (Mich. 2004), and *Motuelle v. Ruffini*, No. 244557, 2004 WL 1254304 (Mich. Ct. App. June 8, 2004).  That argument is also not persuasive because those cases do not apply.  They involved "collateral estoppel" (i.e., issue preclusion), not claim preclusion.  *See Monat*, 677 N.W.2d at 850 ("[W]e believe that the lack of mutuality of estoppel should not preclude the use of collateral estoppel when it is asserted defensively to prevent a party from relitigating an issue that such party has already had a full and fair opportunity to litigate in a prior suit."); *Motuelle*, 2004 WL 1254304, at *4 n.3.  Thus, the Court is not convinced that 81 Dev's claims are barred by the doctrine of claim preclusion under Michigan law.

**(b) Privity – Federal common law**

In *Taylor*, the Supreme Court provided some clarity about what showing is required to establish nonparty preclusion under federal common law.  The Court delineated six categories of "recognized exceptions" to the general rule that preclusion does not apply to a person who was not a party to the prior case.  *Taylor*, 553 U.S. at 893-95.  Those categories are as follows:  (1) the nonparty agreed to be bound by the prior judgment; (2) there exists a "substantive legal relationship" between the person bound by the prior judgment and the nonparty, including "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"; (3) the nonparty was "adequately represented by someone with the same interests," including class actions and suits brought by "trustees, guardians, and other fiduciaries"; (4) the nonparty "assumed control" over the prior litigation, such that they already had their day in court; (5) a party bound by the prior judgment attempts to relitigate through a proxy, such as where the person bringing the later suit is a "designated representative" or agent for the person bound by the prior judgment; and (6) "special statutory scheme[s]" that foreclose successive litigation by nonparties, such as bankruptcy and probate proceedings.  *Id.* (internal quotation marks and brackets omitted).

In *Taylor* itself, the Court disapproved of the expansive theories of "virtual representation" that had proliferated in lower courts, by which a nonparty plaintiff could be bound under a diffuse multifactor balancing test purporting to determine whether it had been "adequately represented" in the prior case due to an "identity of interests and some kind of special relationship between parties and nonparties[.]"  *Id.* at 901.  The Court instead urged a return to the "established grounds for nonparty preclusion[.]"  *Id.* at 904.  For instance, adequate representation generally required a showing that "(1) [t]he interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty[.]"  *Id.* at 900 (internal citation omitted).

21

On the other hand, the Court indicated that its list of exceptions was only a "framework for [its] consideration of virtual representation, not . . . a definitive taxonomy." *Id.* at 893 n.6. *Taylor* involved "an extreme form of claim preclusion in which the current litigant had no legal relationship to the prior litigant." *Ludwig v. Twp. of Van Buren*, 682 F.3d 457, 461 (6th Cir. 2012). The only relationship was the prior litigant's "'strong incentive to litigate'" and the litigants' "use of the same lawyers." *Id.* at 462 (quoting *Taylor*, 553 U.S. at 897). Thus, *Taylor* did not prohibit preclusion in circumstances *outside* the six categories mentioned. *Id.* (noting that the categories "are not constitutionally rigid").

Moreover, *Taylor* "involved different considerations than this case." *Elbert v. Carter*, 903 F.3d 779, 784 (8th Cir. 2018). "A plaintiff who was not a party to a first action 'generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit.'" *Id.* (quoting *Taylor*, 553 U.S. at 892). In contrast, 81 Dev had ample opportunity to litigate its claims against Defendants in its prior lawsuits. As its prior complaints demonstrate, it was aware of the conduct that forms the basis for this action. Thus, "[t]he question here is not whether [Plaintiff] is entitled to the time-honored tradition of his own day in court, but whether he gets 'a second bite at the apple.'" *Id.* (quoting *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989) (quotation marks and citation omitted)). In short, *Taylor* does not prohibit a broader view of preclusion when a party is asserting preclusion defensively because of their relationship to a defendant in a prior case.

That broader view is evident in *Greenlee v. Sandy's Towing & Recovery, Inc.*, 2018 WL 3655961 (6th Cir. Feb. 21, 2018), in which the Court of Appeals for the Sixth Circuit held that a plaintiff could not bring successive suits against a township and the towing company that towed the plaintiff's car. *Id.* at *2. The court noted that "[p]rivies are parties with a 'sufficiently close

relationship' that a judgment as to one is binding as to both." *Id.* (quoting *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1109 (6th Cir. 1981)). The court stated that such a relationship exists "where one party is the agent of the other." *Id.* (citing *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989)).

An agency relationship existed between the township and the towing company in *Greenlee* because, when towing the plaintiff's car, the towing company acted "on the Township's behalf and at the Township's behest." *Id.* (citing Restatement (Third) of Agency § 1.01 (2006)). The "doctrinal basis" for grounding a claim preclusion defense in the principal-agent relationship is as follows:

> Where a plaintiff has sued parties in serial litigation over the same transaction; where plaintiff chose the original forum and had the opportunity to raise all its claims relating to the disputed transaction in the first action; where there was a "special relationship" between the defendants in each action, if not complete identity of parties; and where although the prior action was concluded, the plaintiff's later suit continued to seek essentially similar relief—the courts have denied the plaintiff a second bite at the apple.

*Lubrizol*, 871 F.2d at 1288; *accord ABS Indus.*, 333 F. App'x at 1000 n.5.

*Greenlee* is not directly applicable here. Nothing in 81 Dev's complaint indicates that Defendants acted on behalf of, or at the behest of, YGW, the defendant in the Federal Case. Harless interacted with Young and the Township, but nothing suggests that Harless acted on behalf of YGW. Moreover, as discussed above, the Third Restatement of Agency cited in *Greenlee* states that where "a service provider simply furnishes advice and does not interact with third parties as the representative of the recipient of the advice, the service provider is not acting as an agent." Restatement (Third) of Agency § 1.01(c) (2006). Here, Harless allegedly provided advice to Young and the Township. When doing so, he was not acting as the representative of YGW.

On the other hand, the Court agrees that there was a "sufficiently close relationship" between Defendants and YGW to preclude 81 Dev's action in this case. 81 Dev alleges that

23

Defendants conspired with YGW and the Township to deprive 81 Dev of its right to equal protection.  (*See*, *e.g.*, Compl. ¶ 165.7.)  The Sixth Circuit has not clearly defined what it means for defendants in successive cases to be in privity with one another for purposes of claim preclusion; however, many courts, both state and federal, have held that co-conspirators satisfy that definition.  *See, e.g.*, *Elbert*, 903 F.3d 783-84; *In re El San Juan Hotel Corp.*, 841 F.2d 6, 10-11 (1st Cir. 1988); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 192 (2d Cir. 1985); *Gambocz v. Yelencsics*, 468 F.2d 837, 842 (3d Cir. 1972); *Winrock Grass Farm, Inc. v. Affiliated Real Estate Appraisers of Ark., Inc.*, 373 S.W.3d 907, 913 (Ark. Ct. App. 2010) ("It is . . . widely recognized that coconspirators are privies for res judicata purposes where, as here, the alleged conspirator's existence and actions were known to the plaintiff during the prior litigation." (citing cases from other states)).  The logic of those cases is persuasive.  Any other outcome "'would enable [P]laintiff to avoid the doctrine of res judicata by the simple expedient of not naming all possible defendants in [his] first action.'"  *Elbert*, 903 F.3d at 784 (quoting *Ruple v. City of Vermillion*, 714 F.2d 860, 862 (8th Cir. 1983)).  Indeed, one court has already ruled that 81 Dev's equal protection and conspiracy claims against Young are meritless.  Also, 81 Dev agreed to settle similar claims against YGW and the Township, dismissing them with prejudice.  Permitting 81 Dev to assert practically the same claims against the defendants in this case would give it yet another bite at the same apple.

Alternatively, Defendants contend that the privity requirement is not necessary under federal law because they are asserting preclusion defensively.  As explained by the Court of Appeals for the Sixth Circuit:

> Traditionally, privity was strictly required for application of preclusion; a party could not enjoy the benefit of an earlier action unless they would have been bound by it.  *See, e.g., Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 127 (1912).  More recently, however, many federal circuits have left behind the traditional mutuality requirement for some defensive uses of claim preclusion.  *See, e.g., Randles v. Gregart*, 965 F.2d 90, 93 (6th Cir. 1992); *In re El San Juan*

> *Hotel Corp.*, 841 F.2d 6, 10-11 (1st Cir. 1988).  In these courts, under certain circumstances, a defendant in a subsequent action can take advantage of the claim-preclusive effect of a prior judgment involving the same plaintiff and different defendants.

*Peterson Novelties, Inc. v. City of Berkley*, 305 F.3d 386, 395 (6th Cir. 2002).

In *Randles*, the Sixth Circuit opinion cited in *Peterson Novelties*, the plaintiff brought a second action asserting claims based on facts that were identical to those litigated in his first action. *Randles*, 965 F.2d at 92.  One difference between the two actions was that the plaintiff's second complaint named additional defendants who had not been named in the first complaint.  The district court apparently held that the judgment in the first action barred the claims against those new defendants.  The Court of Appeals affirmed this decision, citing *Hazzard v. Weinberger*, 382 F. Supp. 225 (S.D.N.Y. 1974), in which a New York district court found that nonmutual claim preclusion was appropriate when a pro se litigant brings "repeated actions upon same operative facts with slight change in legal theories and 'cast of characters-defendants.'"  *Randles*, 965 F.2d at 93 (quoting *Hazzard*, 382 F. Supp. at 226-29).  The Court of Appeals held that the district court "was well within its discretion in dismissing" these additional defendants "pursuant to the doctrine of nonmutual *claim or issue preclusion*."  *Id.* at 93 (emphasis added).

Defendants ask the Court to apply a similar rationale here.  One problem for Defendants is that *Randles* did not clearly specify whether it was applying the doctrine of issue preclusion or claim preclusion.  In addition to citing *Hazzard*, the court also cited a Supreme Court opinion, *United States v. Mendoza*, 464 U.S. 154 (1984), which applied the doctrine of nonmutual *issue* preclusion.  *Id.* at 157.  And in subsequent decisions referring to *Randles*, the Court of Appeals has indicated that the mutuality exception applies to *issue* preclusion.  *See, e.g.*, *Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012); *Hancock v. Word*, 27 F. App'x 256, 257 (6th Cir. 2001); *Habtemariam v. Adrian*, No. 98-3112, 1999 WL

455326, at *2 (6th Cir. June 23, 1999). The only appellate decision indicating otherwise, *Peterson Novelties*, referred to *Randles* in dicta because it applied Michigan law regarding claim preclusion, not federal law. *See Peterson Novelties*, 305 F.3d at 395.

Furthermore, as 81 Dev notes, *Randles* is better understood as a case involving issue preclusion, not claim preclusion, because the plaintiff actually litigated the issue giving rise to the preclusion defense. Unlike claim preclusion, issue preclusion only applies to issues "actually decided in a prior case and necessary to the judgment." *See Brownback v. King*, No. 19-546, 2021 WL 726222, at *3 n.3 (U.S. Feb. 25, 2021). In the plaintiff's first case, the district court decided that there no "question of fact concerning whether the deputies had used excessive force in disarming [the plaintiff]," and that the plaintiff's "constitutional rights had not been infringed[.]" *Randles*, 965 F.2d at 92. The plaintiff's second complaint "was based on facts identical to those in the first complaint[.]" *Id.* One of the new defendants in the second case was one of the deputies whom the plaintiff alleged had used excessive force on him. But the issue of excessive force had already been decided in the first case. Consequently, the plaintiff could not relitigate the same issue against a slightly different defendant. That analysis is consistent with issue preclusion.

## IV. Conclusion

In short, the Court rejects Defendants' argument that privity is not necessary under federal law for certain defensive uses of claim preclusion.   However, the Court is persuaded that Defendants have satisfied the privity requirement under federal law and, thus, Plaintiff's claims are precluded.  Accordingly, for that reason, the Court will grant Defendants' motion to dismiss.

The Court will enter an order and judgment consistent with this Opinion.


Dated:   March 9, 2021                              /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   UNITED STATES DISTRICT JUDGE